The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: October 21, 2024

**NO. S-1-SC-39151**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**LUCIO GODINEZ JR.,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**James W. Counts, District Judge**

Hector H. Balderas, Attorney General
John Kloss, Assistant Attorney General
Albuquerque, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Respondent

**OPINION**

**ZAMORA, Justice.**

{1}     The question presented in this appeal is whether the Court of Appeals misapplied *State v. Guthrie*, 2011-NMSC-014, 150 N.M. 84, 257 P.3d 904, when it held that Defendant Lucio Godinez Jr.'s right to due process was violated by the admission of testimonial evidence at his probation revocation hearing, without an opportunity for Defendant to cross-examine the declarant. *See State v. Godinez*, 2022-NMCA-029, ¶ 23, 511 P.3d 369. The district court revoked Defendant's probation, based in part on out-of-court statements made by his adult daughter (Daughter) during a forensic interview. The Court of Appeals reversed, announcing a bright-line rule requiring confrontation when testimonial hearsay is admitted accusing a probationer of a new crime, unless the hearsay is not only reliable, but supported by "unequivocal" corroborating evidence. *Id.* ¶ 19.

{2}     We agree with the Court of Appeals that the challenged testimony violated Defendant's right to due process, and we therefore affirm. But we disavow the Court of Appeals' bright-line rule and clarify that due process in a probation revocation hearing requires a case-by-case analysis of "the need for, and the utility of, confrontation of a live witness in the context of a particular case." *Guthrie*, 2011-NMSC-014, ¶ 2.

# I.     BACKGROUND

{3}     Defendant began serving a five-to-twenty-year probation sentence in August 2014[1] as a result of a no-contest plea to two counts of second-degree criminal sexual contact of a minor. Approximately four years later and while Defendant was still on probation, the State arrested and indicted him on two counts of second-degree criminal sexual penetration of his adult Daughter. The State also petitioned to revoke his probation for violating two conditions of his supervised release: (1) "violat[ing] any of the laws . . . of the State of [New Mexico]" by sexually assaulting Daughter during an authorized visit to his home and (2) failing to inform his probation officer before Daughter's visit that she has autism and the "mind of a 10 year old." Upon arrest, Defendant denied the accusations and called Daughter a liar.

{4}     The district court held an adjudicatory hearing on the State's petition for probation revocation at which the State called the following witnesses to testify: Daughter's mother (Mother), the sexual assault nurse examiner (SANE) who performed Daughter's examination, the forensic interviewer who interviewed Daughter about the alleged assault, and the New Mexico State Police agent who

---

[1]The record contains a discrepancy as to when Defendant began his probation. For purposes of this Opinion, we adopt the date established by the testimony of the probation-parole officer, August 29, 2014.

investigated the report of Daughter's sexual assault.[2] Defendant did not call any witnesses or testify on his own behalf. Daughter did not testify.

{5}     Mother, who was the State's first witness, testified as follows. Daughter has autism and functions "at a first-grade level." At the time of the hearing, Daughter had been in counseling on and off for approximately three years for reasons unrelated to her developmental delay. After the alleged assault, Daughter's counselor recommended to Mother that Daughter not be called to testify because she "couldn't stand trial, that she would go bad." According to Mother, Daughter is afraid of Defendant and said that "he had hit her."

{6}     At the time of the alleged assault, Daughter was twenty-two years old and was staying with Defendant during a planned two-week visit. Daughter had stayed with Defendant two or three times in the past and always returned happy and told Mother everything she had done on her visits. This time, Daughter called Mother daily and was happy, including on Sunday evening, two days before her visit was scheduled to end. Daughter did not call Mother the next morning, so Mother attempted to call her instead. After receiving no answer, Mother called Defendant and demanded to

---

[2]The State also called Defendant's probation officer as a witness, who testified primarily in support of Defendant's alleged violation for failing to disclose Daughter's autism and developmental delay. The district court did not find a violation based on that accusation, and we do not discuss it further in this appeal.

speak to Daughter. When Daughter got on the phone, she was hysterical and told Mother to pick her up.

{7} Mother picked up Daughter that same day (Monday) around lunchtime and noticed that she was crying and did not hug Defendant or say goodbye, which was unusual. Daughter said she was tired and "that she never wanted to go back with her dad." When Daughter got home, she was "distraught" and continued to behave unusually. Instead of watching television or playing with dolls, she followed Mother around the house or sat on the couch. Daughter would also cry loudly in the shower and wake up at night, hit the table, scream, and say "why, why, why Dad?" Mother eventually asked, "did your dad do anything to you?" Daughter "pointed to her behind" and asked to talk to the police. Later, Daughter told Mother that "it" had happened "two times," that Defendant had "hit her," and that Defendant had told her that she could not call Mother. Defendant did not object to Mother's testimony about these interactions with Daughter.

{8} Mother also testified that, after Daughter asked to talk to the police, Mother contacted Daughter's counselor, who helped arrange an interview at the Kid's Inc. safe house and a sexual assault examination for Daughter. When Mother and Daughter arrived at the safe house, a State Police agent was there and asked Mother if she had any clothing from Daughter's visit with Defendant. The agent later went

to Mother's house and took Daughter's suitcase, which Daughter had not unpacked yet. When the agent looked through the suitcase, Mother noticed that Daughter's underwear "was bloody." According to Mother, Daughter was not on her period while she was with Defendant. Mother testified that the blood could not have been the result of Daughter's period because her period came at the end of the month, after she returned home.

{9}     The State next called the SANE, who testified about her examination of Daughter four days after she returned home from Defendant's house. Daughter did not provide a narrative of what had happened, but she nodded "yes" that the assault had occurred on Sunday. Daughter also said that she had menstruated on Sunday, the day of the alleged assault. Daughter cried throughout the exam and "trembled" during the anal exam. Daughter had faint bruising near her genitals and light or yellow bruises on her buttocks and thighs, areas where the SANE had seen bruising in other sexual assault exams. In addition, Daughter had vaginal redness, vaginal discharge that appeared to be from a yeast infection, and excoriated skin around the anus, which also could have been from a yeast infection. Daughter had no visible injuries to her vaginal or anal areas, where the skin tends to heal within forty-eight hours of injury.

{10}     The State next called the forensic interviewer to testify about Daughter's interview, which took place on the same day as the SANE exam. When the interviewer began to testify about what Daughter had told her during the interview, Defendant objected on hearsay grounds and because he would not have an opportunity to cross-examine Daughter at the hearing. The district court overruled both objections, reasoning that the Rules of Evidence and the Sixth Amendment right to confrontation do not apply in probation revocation hearings and because Daughter's out-of-court statements were supported by corroborating evidence.

{11}     The forensic interviewer then gave the following summary of Daughter's interview:

> A: Ultimately [Daughter] said that her butt got hurt. I asked her how her butt got hurt. We had to walk through it basically like I would probably a five or six year old. I had to ask her . . . she told me about two different incidents. I asked her if it happened one time or more than one time; she said "two." I asked her where it happened: "in the living room and in her room." I had to go through the whole, were your pants on or were your pants off; she said "off." I said were your panties on or were they off, and they were off. We talked about how dad was. Dad's pants were off. Dad's underwear were off. The instance she was laying face down and he was behind her and she said that he was spanking her.
>
> Q: Was she able to explain what she meant by that?
>
> A: She said it hurt. But when I said on the outside or on the inside she said it hurt on the inside. I said who said it was a spanking and she said her dad called it a spanking.

The forensic interviewer continued, saying that she had asked Daughter to identify what body parts Defendant had used to "spank" her and what body parts had been hurt. Daughter circled the penis on a male diagram and underlined the buttocks on a female diagram. The district court admitted both diagrams into evidence. Daughter also said that the two incidents had happened on different days and that when "her butt got hurt, no one was home but her and Dad."[3]

{12}     The last witness to testify was the State Police agent who investigated the alleged assault. The agent responded to a phone call from the forensic interviewer informing the agent that she was about to interview Daughter about an incident that had not yet been reported to law enforcement. The agent went to the safe house and, after Daughter's interview, asked Mother where the clothing was that Daughter had worn at Defendant's house. The agent later went to Mother's house and picked up the clothing, which Mother said had not been washed, and sent it to the state crime

---

[3]The district court also admitted an audio-visual recording of the forensic interview but did not view the recording before rendering a decision. We therefore do not consider it in our analysis.

lab for DNA testing.[4] According to the lab report, no semen was detected, but unidentified male DNA was found on four pairs of Daughter's underwear, including in the "inside crotch area." Although most of the DNA was insufficient for conventional testing, DNA from two pairs of the underwear might have been sufficient for advanced testing, and a sample of Defendant's DNA had been taken and sent to the crime lab for that purpose. But at the time of the revocation hearing, no other DNA test results were available.

{13} The agent also testified that he had interviewed and arrested Defendant a few days after Daughter's forensic interview. Defendant admitted that he was home alone with Daughter on Sunday because his fiancée had been bitten by a stray dog and hospitalized on Saturday evening for the next four days. He also said that Daughter had not been left alone with anyone else after his fiancée was hospitalized. Defendant noticed a change in Daughter's demeanor on Sunday, but he did not know

[4]Defendant objected to this evidence on confrontation grounds in the Court of Appeals. The Court of Appeals assumed "without deciding that there was good cause to dispense with confrontation as to the crime lab analyst" who performed the analysis of the underwear for the purpose of analyzing Daughter's statements to the forensic interviewer. *Godinez*, 2022-NMCA-029, ¶ 20 n.6. Defendant did not challenge admission of DNA evidence in this Court. *See State v. Sanchez*, 2001-NMCA-060, ¶ 17, 130 N.M. 602, 28 P.3d 1143 (holding that laboratory reports are admissible in probation revocation hearings if the State complies with certain procedural requirements).

what was going on with her or what had happened. Defendant said he never hit Daughter.

{14} The district court revoked Defendant's probation based on a reasonable certainty that Defendant had violated his probation by sexually assaulting Daughter, by "criminal sexual contact at minimum, more likely penetration." As part of that determination, the district court found that Daughter's "mental capacity was not such that she could give consent." The district court reiterated that the Confrontation Clause does not apply to probation revocation proceedings and that none of the testimony required an opportunity to cross-examine Daughter. The district court also emphasized that, even if it were wrong and confrontation was required, "there were a number of statements that were nontestimonial in nature—spontaneous statements by [Daughter]—that would not invoke the Confrontation Clause even if it were available in this case."

{15} The district court then summarized the evidence that corroborated Daughter's statements to the forensic interviewer, including the "night and day change" in Daughter's demeanor between her phone calls with Mother on Sunday and Monday; the blood in her underwear that, based on Mother's credible testimony, was not likely the result of Daughter's menstrual cycle and could be explained by sexual assault; the male DNA found in four pairs of Daughter's underwear when no male

other than Defendant was alone with Daughter "during the relevant times"; and Daughter's physical injuries as reported by the SANE, including bruises of various colors on her genitals, buttocks, and thighs. The district court revoked Defendant's probation and ordered Defendant to serve the sixteen-year suspended period of his original prison sentence. The State subsequently dismissed without prejudice the two counts of second-degree criminal sexual penetration against Defendant.

{16} Defendant appealed his probation revocation, arguing under *Guthrie* that admission of Daughter's out-of-court statements to the forensic interviewer, without an opportunity to cross-examine Daughter, violated his right to due process. The Court of Appeals agreed and reversed. *Godinez*, 2022-NMCA-029, ¶ 1. Recognizing that *Guthrie* requires a case-by-case analysis of the need for, and utility of, confrontation, the Court of Appeals nonetheless announced a bright-line rule for cases in which (1) revocation is sought for the commission of an unadjudicated crime, (2) the challenged hearsay statements "are central to the state's case [and] not inherently reliable," and (3) the truth of the statements depends on "a subjective judgment of the declarant's credibility." *Id.* ¶¶ 14, 19. In these specific circumstances, confrontation is required unless the State introduces "unequivocal and reliable corroborating evidence . . . [that] compellingly establishes that the crime occurred and that the probationer committed it." *Id.* Applied to this case, the Court

of Appeals reviewed the corroborating evidence cited by the district court and held that, because all of it was "subject to conflicting interpretations," the evidence did not "compellingly establish the truth of the allegation so as to render confrontation unnecessary." *Id.* ¶ 20. Accordingly, Defendant's right to due process was violated by admitting Daughter's out-of-court statements without an opportunity for cross-examination. *Id.* ¶ 23. We granted certiorari and affirm for the reasons set forth in this opinion.

## II.    DISCUSSION

### A.    Standard of Review

{17}    A probationer's right to confrontation is a legal question that we review de novo, while deferring to the district court's factual findings if supported by substantial evidence. *See Guthrie*, 2011-NMSC-014, ¶ 22; *see also State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183 ("This Court reviews factual matters with deference to the district court's findings if substantial evidence exists to support them, and it reviews the district court's application of the law de novo." (citation omitted)). The State bears the burden of proving a probation violation to a reasonable certainty, a determination that we review for an abuse of discretion. *See, e.g., State v. Aslin*, 2018-NMCA-043, ¶ 8, 421 P.3d 843, *reversed on other grounds*, 2020-NMSC-004, ¶ 14, 457 P.3d 249.

**B.** *Guthrie* **Requires a Case-by-Case Determination of Whether Due Process Requires Confrontation in a Probation Revocation Proceeding**

{18}   The State seeks reversal of the Court of Appeals, arguing that the district court properly concluded that it had sufficient corroborating evidence to "dispense with confrontation in this case" without violating due process. The State also argues that the Court of Appeals misapplied *Guthrie* and "conducted a divide-and-conquer analysis of the various pieces of corroborating evidence in which it reweighed that evidence and substituted its judgments on credibility and reliability for those of the district court." Because *Guthrie* is central to our analysis in this opinion, we first review its facts and holding before we consider the State's arguments.

{19}   "[T]he revocation of parole [or probation] is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole [or probation] revocations." *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) (citation omitted); *see also Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973) (perceiving no "difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation"). In particular, a probationer's right to confrontation is *not* the inflexible right "guaranteed every accused in a criminal trial" under the Sixth Amendment. *Guthrie*, 2011-NMSC-014, ¶ 12; *see also, e.g., Bullcoming v. New Mexico*, 564 U.S. 647, 662 (2011) ("[T]he [Confrontation] Clause does not tolerate dispensing with confrontation simply

because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination."). Rather, a probationer's confrontation right arises under the Fourteenth Amendment as a matter of due process. *Guthrie*, 2011-NMSC-014, ¶ 12 (discussing *Morrissey*, 408 U.S. at 472, 497). Due process "is flexible and calls for such procedural protections as the particular situation demands." *Guthrie*, 2011-NMSC-014, ¶ 11 (internal quotation marks and citation omitted). As a general rule however, due process guarantees a probationer "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id.* ¶ 12 (quoting *Gagnon*, 411 U.S. at 786 (internal quotation marks omitted)).

{20} *Guthrie* considered whether the good-cause exception for not requiring confrontation of the defendant's accuser was satisfied in that case. 2011-NMSC-014, ¶¶ 45-49. At issue was whether the defendant's confrontation right was violated by the admission of the probation supervisor's testimony about a facsimile transmission from a residential treatment center saying that the defendant had failed to complete treatment, a required condition of his probation. *Id.* ¶ 46. Though the probation supervisor did not have personal knowledge of the alleged violation, the defendant's probation officer was not available to testify. *Id.* ¶¶ 1, 46. The district court admitted the fax through the testimony of the supervisor of the defendant's probation officer,

13

without requiring live testimony from a treatment-center representative or the probation officer himself. *Id.* ¶¶ 1, 47.

{21}     To decide *Guthrie* and "guide the due process inquiry" in future cases, *id.* ¶ 2, the Court adopted a practical, "need-for-confrontation analysis," which it described as a "spectrum or sliding scale with extremes at either end and much balancing and weighing of competing interests in between." *Id.* ¶ 40. At the "'no good cause' end of the spectrum," where confrontation must be allowed, the evidence is "contested by the defendant, unsupported or contradicted, and its source has a motive to fabricate," and "it is about a subjective, judgment-based observation that is subject to inference and interpretation, and makes a conclusion that is central to the necessary proof that the defendant violated probation." *Id.* ¶ 41. At the other end of the spectrum, where there is good cause to *not* require confrontation, "the [s]tate's evidence is uncontested, corroborated by other reliable evidence, and documented by a reliable source without a motive to fabricate," or it "is about an objective conclusion, a routine recording, or a negative fact, making the demeanor and credibility of the witness less relevant to the truth-finding process." *Id.* ¶ 40.

{22}     The facts in *Guthrie* fell "decisively" on the good cause end of the spectrum, such that confrontation was unnecessary. *Id.* ¶ 45. The need for, and utility of, confrontation was de minimis in that case because (1) the primary allegation at

14

issue—that the probationer failed to complete residential treatment—was uncontested, *see id.*; (2) the allegation concerned "an objective, negative, and rather routine fact [that] was easily and reliably established to a reasonable degree of certainty by a written statement," *id.* ¶ 46; (3) "little to nothing could be gained by [live] testimony" when neither declarant associated with the fax "had any known motive to fabricate or deceive" about the allegation, *id.* ¶ 47; and (4) the truth of the allegation was self-evident from the time and place of the probationer's arrest, which was during the treatment period and away from the treatment center, *id.* ¶ 48. Under these circumstances, including that proof of the violation was "incontrovertibl[e]," good cause supported admitting the fax without requiring confrontation. *Id.* ¶ 49.

{23}    *Guthrie* was also careful to illustrate the counter-example, when confrontation must be required.[5] The Court agreed with the result in *State v. Vigil*, in which the Court of Appeals reversed an order revoking probation based solely on a confidential

---

[5]We disagree with the Court of Appeals that this case presents "a set of facts not clearly contemplated by the governing framework that *Guthrie* created." *Godinez*, 2022-NMCA-029, ¶ 1. *Guthrie* went to great lengths to articulate a comprehensive framework for analyzing the need for confrontation—including in cases where confrontation must be required—despite the straightforward inquiry in *Guthrie* where the violation itself was uncontested. *See* 2011-NMSC-014, ¶¶ 40-41, 45 ("[The probationer] did not contest the allegation that he failed to complete his treatment at the rehabilitation center, thus precluding a due process complaint under *Morrissey*'s requirement for a hearing on contested facts." (citation omitted)).

informant's "sworn, out-of-court statements accusing [the] probationer . . . of having committed a new crime—possessing stolen property—while on probation." *Guthrie*, 2011-NMSC-014, ¶ 16 (citing *State v. Vigil*, 1982-NMCA-058, ¶¶ 3-4, 97 N.M. 749, 643 P.2d 618). Because the defendant in *Vigil* was "unable to cross-examine his accuser," *Guthrie*, 2011-NMSC-014, ¶ 16, the right to confrontation was "'violated to the extent the trial court relied on the informant's sealed answers in revoking probation.'" *Id.* (quoting *Vigil*, 1982-NMCA-058, ¶ 11). *Guthrie* emphasized that, when revocation is sought based on an out-of-court accusation of a new, unadjudicated crime, "we would be hard pressed to envision a situation in which personal testimony and confrontation would not be required." *Id.* ¶ 38.

{24}    Between the two extremes exemplified in *Guthrie*, "there is no bright-line rule for determining good cause" to not require confrontation. *Id.* ¶ 41. While a probationer has a presumptive right to confrontation, the issue must be decided on a case-by-case basis, guided by the due-process command of fundamental fairness under the circumstances of each case. *Guthrie*, 2011-NMSC-014, ¶¶ 12, 33; *accord State v. Wheeler*, S-1-SC-37709, dec. ¶ 17 (N.M. June 10, 2021) (nonprecedential) ("[T]here is a rebuttable presumption that a probationer has the right of confrontation."). The analysis must focus "on the relative need for confrontation to protect the truth-finding process and the substantial reliability of the [challenged]

16

evidence." *Guthrie*, 2011-NMSC-014, ¶ 43. *Guthrie* thus requires a practical inquiry, keeping in mind that "'the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.'" *Id.* ¶ 33 (quoting *Morrissey*, 408 U.S. at 489). At bottom, a court must determine "the need for, and utility of, confrontation with respect to the truth-finding process and in light of the particular case at hand, including the specific charge pressed against the probationer." *Id.* ¶ 43.

**C.    *Guthrie* Requires Confrontation in This Case**

{25}    Applying *Guthrie* to this case, we first observe that Daughter's statements during the forensic interview were testimonial and would trigger a Sixth Amendment right to confrontation were this a criminal trial. *See, e.g.*, *State v. Tsosie*, 2022-NMSC-017, ¶ 28, 516 P.3d 1116 ("'[Statements] are testimonial when . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006) (alterations omitted)); *see also, e.g.*, *Bobadilla v. Carson*, 575 F.3d 785, 792 (8th Cir. 2009) (holding that statements made during a forensic interview were testimonial when the interviewer was acting as a "surrogate interviewer for the police" (internal quotation marks omitted)). We therefore start with the presumption that Defendant has a due process right to confront Daughter about her out-of-court

17

statements to the forensic interviewer, unless there is good cause for not requiring confrontation. *See Guthrie*, 2011-NMSC-014, ¶ 12. We also are mindful that the State sought revocation based on the accusation of a new, unadjudicated crime. *See id.* ¶ 38. Accordingly, we begin our need-for-confrontation inquiry skeptical of dispensing with confrontation in this case. *Accord Wheeler*, S-1-SC-37709, dec. ¶ 21.

{26}   Under our sliding-scale analysis, we look to the following list of non-exhaustive factors in relation to the challenged evidence: (1) whether it is contested or uncontested; (2) whether it is central or collateral to proving the alleged violation; (3) whether "it is about a subjective, judgment-based observation that is subject to inference and interpretation," making the witness's demeanor and credibility highly relevant to the truth-finding process, or "about an objective conclusion, a routine recording, or a negative fact, making the demeanor and credibility of the witness less relevant to the truth-finding process"; (4) whether its source is reliable or unreliable because the source does or does not have a motive to fabricate; and (5) whether it is corroborated by a reliable source or is unsupported or contradicted. *Guthrie*, 2011-NMSC-014, ¶¶ 40-41.

{27}   The evidence challenged in this case is the forensic interviewer's testimony recounting Daughter's statements during the interview. According to the

interviewer, Daughter said Defendant "spank[ed]" her on two occasions when neither was wearing pants or underwear, that she was lying face down and Defendant was behind her, and that her "butt got hurt," "on the inside." Daughter also said that Defendant had called it "a spanking," and she indicated on diagrams admitted into evidence that Defendant had used his penis to "spank[]" her on the buttocks.

**1.      Four *Guthrie* factors are supportive or neutral in relation to the presumptive right to confrontation**

{28}     Applied to this evidence, three of the factors require little analysis. First, unlike the uncontested evidence in *Guthrie*, Defendant contests the truth of Daughter's statements to the forensic interviewer, presumptively requiring confrontation absent a showing of good cause. *Id.* ¶ 35 ("[C]onfrontation[ is] only necessary when the truth of the state's allegations is challenged."). Second, Daughter's statements to the interviewer are highly probative of the State's accusation that Defendant sexually assaulted Daughter, making her first-hand account "central to the necessary proof that [D]efendant violated probation." *Id.* ¶ 41. Third, far from proving "an objective, negative, and rather routine fact" like the failure to complete residential treatment in *Guthrie*, *id.* ¶ 46, Daughter's statements to the forensic interviewer are "about [Daughter's] subjective, judgment-based observation[s] that [are] subject to inference and interpretation" about what transpired. *Id.* ¶ 41. Her demeanor and credibility are relevant to the truth-finding

process, *see id.* ¶ 40, and her allegations are precisely the kind that ordinarily "must be tested in the crucible of cross examination." *Id.* ¶ 36. These factors weigh against a finding of good cause for not requiring confrontation in this case.

{29}    The fourth factor, whether the source of the evidence is reliable or unreliable depending on the presence or absence of a motive to fabricate, weighs neutrally. As the purported victim of a contested crime, Daughter is not a neutral or disinterested witness whose reliability may be assumed absent evidence to the contrary. *Cf. Guthrie*, 2011-NMSC-014, ¶ 27 (discussing *Bailey v. State*, 327 Md. 689, 703, 612 A.2d 288, 295 (1992), in which "the source of the information (the treatment center) was reliable because it was 'duty-bound to report . . . any failure of the probationer to comply with its conditions for the completion of its program'"); *cf. also Strickland v. Roosevelt Cnty. Elec. Coop.*, 1980-NMCA-012, ¶ 24, 94 N.M. 459, 612 P.2d 689 ("The general rule is that evidence given by an interested witness, even though uncontradicted, presents an issue to be determined by the jury."). However, we have no reason to suspect that Daughter has a motive to fabricate, nor has the State argued that she is particularly trustworthy. This factor thus does little to inform our analysis.

**2.    While the evidence was neither unsupported nor contradicted under the fifth *Guthrie* factor, it was also not sufficiently corroborated to overcome the right to confrontation as to the sexual assault allegations**

{30}    If good cause is to be found for not requiring confrontation in this case, it must come from the last *Guthrie* factor, whether the challenged evidence is corroborated by a reliable witness or whether it is unsupported or contradicted. The State argues that confrontation was unnecessary because of the "considerable amount of additional evidence corroborating that [Defendant] had committed a sexual assault on [Daughter] during his time alone with her." Defendant argues that he denied the truth of Daughter's statements to the interviewer and that the other evidence was not "inherently reliable" or sufficient to corroborate Daughter's statements and obviate the need for confrontation.

{31}    We agree that the State introduced a considerable amount of additional evidence to support revocation, beyond Daughter's statements to the interviewer. We also do not reweigh or second-guess the district court's factual findings based on that evidence, including that there was a "night and day change" in Daughter's demeanor, that the blood in Daughter's underwear was not a result of her menstrual cycle and could be explained by sexual assault, that Daughter had physical injuries that similarly could be explained by sexual assault, and that male DNA was found

21

in four pairs of Daughter's underwear with no male other than Defendant identified as a potential source.

{32}     These findings have not been challenged on appeal.[6] They also are well-supported by other evidence not cited by the district court, including that Daughter said Defendant hit her and that it happened two times; that Daughter would cry in the shower, wake up screaming, hit the table, and say, "why, why, why Dad?"; that Daughter pointed to "her behind" and asked to contact the police when Mother asked whether anything happened at Defendant's house; that Daughter nodded "yes" when asked by the SANE if the assault had occurred on Sunday; that Daughter was "very withdrawn, very upset" during the forensic interview; and that Defendant admitted he was alone with Daughter on Sunday and that no one else was alone with her during that time. This evidence was admitted without objection and, when combined with the bruising observed during the SANE examination, supports an inference that

---

[6]We caution the Court of Appeals to avoid reweighing or substituting its view of the evidence supporting the district court's findings when they have not been challenged on appeal. *See Godinez*, 2022-NMCA-029, ¶ 20 (reviewing the corroborating evidence and concluding that it was "subject to conflicting interpretations"). This case presents only the legal question of whether due process requires confrontation, based on the record and the district court's unchallenged findings. *Cf. Guthrie*, 2011-NMSC-014, ¶ 49 (affirming when the district court "made no explicit findings of good cause" but when the record supported that the probationer violated the terms of his probation).

22

Defendant inflicted some form of physical abuse on Daughter, likely amounting to a battery. *See* NMSA 1978, § 30-3-4 (1963) ("Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner."). Had the district court revoked Defendant's probation on that basis, which also would have been a probation violation of "*any* of the laws . . . of the State of [New Mexico]," confrontation likely would not have been required. The other evidence before the district court strongly corroborated Daughter's statements to the interviewer for the purpose of proving a battery.

{33} But the district court revoked probation based on a finding of "criminal sexual contact at minimum," and the State does not seek reversal based on evidence of a lesser offense such as battery. The specific basis for revocation in this case is therefore significant, given the broad discretion afforded the district court when a violation has been established. *See* NMSA 1978, § 31-21-15(B) (2016) ("If the violation is established, the court may continue the original probation or revoke the probation and either order a new probation with any condition provided for [by statute] or require the probationer to serve the balance of the sentence imposed or any lesser sentence."). Accordingly, we limit our analysis to whether the other evidence introduced by the State rendered Daughter's statements to the interviewer

sufficiently reliable to prove the offense of criminal sexual contact, the lowest level of offense actually found by the district court.

{34}  Focusing on criminal sexual contact, Daughter's statements to the forensic interviewer were the only direct evidence offered by the State to prove an essential element of the offense under either theory set forth in the statute. *See* NMSA 1978, § 30-9-12(A) (1993) (defining criminal sexual contact as "the unlawful and intentional touching of or application of force, without consent, to the unclothed intimate parts of another who has reached his eighteenth birthday, or intentionally causing another who has reached his eighteenth birthday to touch one's intimate parts"); *see also* § 30-9-12(E) ("'[I]ntimate parts' means the primary genital area, groin, buttocks, anus or breast."). Specifically, Daughter's statements that she was not wearing pants or underwear when the "spanking" occurred was the only direct evidence that Defendant touched or applied force to her "*unclothed* intimate parts." Section 30-9-12(A) (emphasis added). Alternatively, Daughter's notation on the male diagram that Defendant had "spanked" her with his penis was the only direct evidence that he caused her "to touch [his] intimate parts." *Id.*

{35}  Based on our de novo review, none of the other evidence reliably corroborates Daughter's statements that Defendant applied force to her unclothed buttocks or that he caused her to touch his penis. The strongest evidence that may have corroborated

either accusation was the district court's finding that unidentified male DNA was found on four pairs of Daughter's underwear without any male besides Defendant identified as a potential source. But even with full deference to that finding, the probative value of the DNA evidence was extremely limited. For example, no semen was detected, and there was no testimony about the type or amount of DNA or how it may have been present in Daughter's underwear. There also was no testimony about when Daughter wore the four pairs of underwear, whether before or after the alleged sexual assault occurred. The DNA evidence does not sufficiently corroborate Daughter's out-of-court description of a touching that would have met the elements of criminal sexual contact.

{36} We have previously held that a child's out-of-court statements to a forensic interviewer were sufficiently reliable to be admissible without requiring confrontation where the right to confrontation similarly arises as a matter of due process. *See State ex rel. Children, Youth & Families Dep't v. Pamela R.D.G. & Frank G* (*In re Pamela A.G.*), 2006-NMSC-019, ¶ 12, 139 N.M. 459, 134 P.3d 746 ("The opportunity to confront a witness in a civil neglect and abuse proceeding is not an absolute right. Instead the right requires that parents be given a reasonable opportunity to confront and cross-examine a witness, including a child witness."). In *Pamela A.G.*, the district court admitted testimony from four witnesses about

25

statements made by a four-year-old child that "were unambiguous in both the description of the [sexual] abuse and the identity of the abuser." *Id.* ¶ 16. We agreed that due process did not require confrontation and highlighted the evidence in the record that provided "the circumstantial guarantee of trustworthiness" to obviate the need for confrontation, including the consistency of the child's multiple statements, the child's use of age-appropriate language to describe the abuse, the sexualized behavior, nightmares, and sleep disturbances described by the child's therapist that were consistent with child sexual abuse, and the spontaneity of the child's identification of her abuser. *Id.*

{37}   Although *Pamela A.G.* arose in a different context, we find it instructive here.[7] Unlike the child's multiple, "unambiguous" statements in that case, Daughter's statements to the interviewer in this case provide the single detailed description in the record of the incidents underlying the State's accusations of sexual assault. In addition, Daughter's statements are equivocal about whether the abuse amounted to criminal sexual contact or another form of physical abuse not found by the district court, such as a battery. And while Daughter's statements to the interviewer are not

---

[7]We acknowledge that, unlike the abuse and neglect proceeding in *Pamela A.G.*, the Rules of Evidence do not apply in probation revocation proceedings. *See* Rule 11-1101(D)(3)(d) NMRA. We nonetheless find the discussion in *Pamela A.G.* instructive in this case.

entirely unsupported or contradicted by other evidence, no other evidence in this case sufficiently provides "the circumstantial guarantee of trustworthiness" of Daughter's statements to prove the offense of criminal sexual contact without requiring confrontation. *See Pamela A.G.*, 2009-NMSC-019, ¶ 16. On balance, the fifth *Guthrie* factor therefore slightly weighs against finding good cause for not requiring confrontation.

{38} We hold that the district court violated Defendant's right to due process by admitting Daughter's statements to the interviewer without good cause for not requiring confrontation to challenge the allegations of sexual assault. And because the challenged statements were the only direct evidence of an essential element of the lowest level of offense found by the district court, criminal sexual contact, we hold that the error was not harmless. *Cf., e.g.*, *State v. Johnson*, 2004-NMSC-029, ¶¶ 7, 32, 43, 136 N.M. 348, 98 P.3d 998 (holding that the admission of testimonial hearsay in a criminal trial without requiring confrontation was not harmless error because the out-of-court statement "provided the only direct evidence of guilt").

{39} We reiterate that our holding is based on the case-by-case analysis required under *Guthrie*. Accordingly, we disavow the Court of Appeals' attempt to fashion a bright-line rule to apply in a particular category of cases. *See Godinez*, 2022-NMCA-029, ¶ 19 ("Under these circumstances, confrontation is essential to the truth-finding

process unless corroborating evidence compellingly establishes that the crime occurred and that the probationer committed it."). We acknowledge that the strength of corroborating evidence may be a significant factor in the good-cause analysis. *See Guthrie*, 2011-NMSC-014, ¶ 49 (noting that the record "incontrovertibly" supports the finding that the probationer violated the terms of his probation). But the inquiry must focus on "the need for, and utility of, confrontation with respect to the truth-finding process and in light of the particular case at hand, including the specific charge pressed against the probationer." *Id.* ¶ 43.

**D.     Availability of the Witness**

{40}     Before we conclude, we briefly address the State's argument that the district court properly dispensed with Defendant's right to confrontation, in part, because of Daughter's developmental delay and her potential for regression were she compelled to testify in court. This argument overlooks our holding in *Guthrie* that, when the need for confrontation is significant, "the witness must appear and be subject to confrontation, regardless of the reasons for his or her absence. . . . Simply put, the reasons for the witness's absence are, for the most part, irrelevant to the balancing process we set forth." *Id.* ¶ 43. While we adhere to that view, we emphasize that the due process right to confrontation is flexible. At the center of the inquiry "are considerations of pragmatism and fairness and the utility of confrontation in a

28

particular factual context." *Guthrie*, 2011-NMSC-014, ¶ 33. District courts have wide latitude in how they ensure fairness to a probationer while considering the rights and circumstances of a particular witness. *See, e.g.*, *Gagnon*, 411 U.S. at 782 n.5 ("Nor did we intend to foreclose the [s]tates . . . from developing other creative solutions to the practical difficulties of the *Morrissey* requirements."); *see also* N.M. Const. art. II, § 24(A)(1) (setting forth the rights afforded to crime victims, including "the right to be treated with fairness and respect for the victim's dignity and privacy throughout the criminal justice process").

{41}     In this case, because the district court did not require confrontation, it similarly did not consider how to ensure fairness to Defendant in light of Daughter's specific circumstances. As a result, the district court made no findings about whether or to what extent Daughter's developmental delay or potential for regression may have affected her ability to provide live, in-court testimony. We decline the State's invitation to make such findings on appeal. *See, e.g.*, *Blaze Constr. Co. v. Tax. & Rev. Dep't of N.M.*, 1994-NMSC-110, ¶ 24, 118 N.M. 647, 884 P.2d 803 ("It is well established that an appellate court will not find facts on appeal." (citation omitted)). We note, however, that district courts may fashion alternatives to live, in-court testimony and cross-examination in appropriate circumstances, including when necessary to accommodate a witness who may be harmed by testifying, or

unable to testify effectively, in open court. *See, e.g.*, NMSA 1978, § 38-6-8(B) (2023) (providing that a district court "may order the use of . . . alternative procedures . . . for taking the testimony of [a] witness with a developmental or intellectual disability" when the court finds that testifying in open court will likely cause the witness "to suffer unreasonable and unnecessary mental or emotional harm; or . . . a temporary loss of or regression in cognitive or behavioral functioning or communicative abilities"); § 38-6-8(D) (2023) (listing "alternative procedures . . . for taking the testimony of [a] witness with a developmental or intellectual disability"); *see also* NMSA 1978, § 38-6A-5 (2011) (providing that a child witness may testify by "alternative method" in criminal and noncriminal proceedings in certain circumstances); NMSA 1978, § 38-6A-2(A) (2023) (defining "alternative method[s]" of testimony by a child witness).

**{42}** Due process "should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Morrissey*, 408 U.S. at 489. If there is a new hearing in district court, the parties may find a solution to the practical difficulties of the confrontation requirement that causes the least harm to Daughter. *See Gagnon*, 411 U.S. at 782 n.5 ("Nor did we intend to foreclose the [s]tates . . . from developing other creative solutions to the practical difficulties of the *Morrissey* requirements.").

30

## III.   CONCLUSION

{43}   We affirm the Court of Appeals for the reasons provided in this opinion. We remand to the district court for such further revocation proceedings as the State may choose to pursue.

{44}   **IT IS SO ORDERED.**

_____

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**

31